**Daniel WEISS, M.D., Plaintiffs,**

v.

**STANDARD INSURANCE COMPANY, Defendant.**

**Case No. 08–80712–CIV.**

United States District Court, S.D. Florida.

Nov. 6, 2009.

Cesar Gavidia, Jr., Gregory Michael Dell, Dell & Schaeffer, Hollywood, FL, for Plaintiffs.

Jerel Charles Dawson, Jonathan Matthew Fordin, Shutts & Bowen, Miami, FL, for Defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

KENNETH L. RYSKAMP, District Judge.

THIS CAUSE comes before the Court pursuant to Defendant Standard Insurance Company's ("Defendant") Motion for Summary Judgment, filed July 17, 2009 [**DE** 34]. Plaintiff Daniel Weiss, MD ("Plaintiff") responded on August 10, 2009 [**DE** 41]. Defendant replied on August 20, 2009 [**DE** 43]. The Court held a hearing on this motion on September 16, 2009. This motion is ripe for adjudication.

## I. BACKGROUND

This is an action for breach of contract arising out of a disability insurance contract between the parties. On or about November 1, 2000, Defendant issued to Plaintiff disability income insurance contract # 640885–B ("Policy"), which provides benefits in the event of a disability as defined in the contract.

From 1994–2007, Plaintiff was a cardiologist with Florida Arrhythmia Consultants in Fort Lauderdale, FL. Plaintiff specializes in electrophysiology, a cardiology subspecialty concerned with diagnosing and treating arrhythmias. Plaintiff is Board Certified in Cardiology and Electrophysiology, with both certifications valid from 2004 through 2014.

To be eligible for long term disability ("LTD") benefits under the Policy, a claimant must submit proof of becoming disabled while insured under the Policy and that the claimant is otherwise entitled to benefits under the Policy terms. To be insured under the Policy, the member is required to be actively at work at least 30 hours "each week." Eligibility for benefits is subject to a waiting period, the "period you must be continuously Disabled before LTD Benefits become payable." Plaintiff's waiting period was 90 days. Plaintiff was required to furnish proof of disability within 90 days after the end of the waiting period.

The Policy defines "disability" as the inability, due to disease or injury, to perform with reasonable continuity the material duties of one's "Own Occupation." The Policy defines "Own Occupation" as follows:

Own Occupation means any employment, business, trade, profession, calling

or rotation that involves Material Duties of the same general character as the occupation you are regularly performing for your Employer when Disability begins. In determining your Own Occupation, we are not limited to looking at the way you perform your job for your employer, but we may also look at the way the occupation is generally performed in the national economy. If your Own Occupation involves the rendering of professional services, and you are required to have a professional or occupational license in order to work, your Own Occupation is as broad as the scope of your license.

However, if your Own Occupation is medical doctor, during the Benefit Waiting Period in the first 24 months of the Own Occupation Period, we will consider your Own Occupation to be the one medical specialty in which you are board certified to practice, provided you have earned at least 60% of your gross professional service fee income in your specialty during the 24 months immediately before you become Disabled.

The Policy defines "Material Duties" as follows:

Material Duties means the essential tasks, functions and operations, and the skills, abilities, knowledge, training and experience, generally required by employers from those engaged in a particular occupation that cannot be reasonably modified or amended. In no event will we consider working an average of more than 40 hours per week to be a Material Duty.

The Policy also contains the following provision:

You must be under the ongoing care of a Physician in the appropriate specialty as determined by us during a Benefit Waiting Period. No LTD Benefits will be paid for any period of Disability when you are not under the ongoing care of the Physician in the appropriate specialty as determined by us.

In or about 1999 or 2000, Plaintiff allegedly began experiencing lower back pain while performing medical procedures. On October 2, 2003, Plaintiff was seen by Howard Rudnick, M.D. ("Dr. Rudnick"), an orthopedist. Plaintiff complained of upper and lower back pain that occurred when he performed procedures that required him to wear a lead apron. Dr. Rudnick diagnosed acute/chronic thoraco-lumbar muscle strain and recommended physical therapy and a thoraco-lumbar orthotic to be worn with the apron. On November 4, 2003, Plaintiff advised Dr. Rudnick that he had obtained a new lead apron that was lighter and provided lumbar support, but while this new apron helped his lower back pain, his upper back pain had worsened. Plaintiff maintains that he received physical therapy in Dr. Rudnick's office from January–March 2004.

On March 10, 2004, Plaintiff saw Roy Katzin, M.D. ("Dr. Katzin"), a neurologist. Plaintiff complained of pain radiating down his right arm with numbness/tingling in two fingers. Dr. Katzin reviewed MRI studies from January of 2004, which indicated "evidence for a right paracentral disc herniation at C5–6." Under "Impression," Dr. Katzin's treatment note stated "Right C6 Radiculopathy."

On or about August 4, 2004, Plaintiff, his wife and their four children moved to Israel. Beginning in August of 2004, Plaintiff typically spent 18 days of every month in Israel and the remaining 12 days in the U.S. He would typically "arrive on a Sunday night or Monday morning, work that week, take call that weekend, work a few days into the following week and then depart, usually in time to be back in Israel for the second weekend." Weiss worked an average of 75 to 80 hours per week

until August 2004, at which time he cut his hours in half.

Plaintiff saw Dr. Katzin again on August 19, 2005. Dr. Katzin noted that he had previously seen Plaintiff "once about 18 months ago." Dr. Katzin also noted that Weiss had "played tennis recently." Plaintiff complained of neck and shoulder pain and numbness/tingling in three fingers on his right hand. Dr. Katzin's impressions were that Plaintiff had current right cervical radiculopathy, right ulnar neuropathy at the elbow, and right brachial plexopathy.

Plaintiff saw Dr. Katzin again on December 1, 2005. Dr. Katzin reported that since August of 2005, Plaintiff had "continued to have intermittent, fluctuating tingling" in three fingers. During that time, Plaintiff experienced "no significant cervical or radicular pain, although he has right shoulder discomfort when he wears a heavy-lead apron during cardiac procedures." Dr. Katzin "reassured" Plaintiff that his symptoms were "not likely to be disabling or progressive."

During 2006, Plaintiff continue to perform his "job as an electrophysiologist" for 12 days each month. In July of 2006, Plaintiff made a claim for LTD benefits under the Policy. The claim was supported by a Attending Physician Statement ("APS") from Dr. Katzin, dated June 22, 2006. The diagnoses were cervical radiculopathy and ulnar neuropathy, with symptoms of right shoulder pain and numbness/tingling in the right hand. In the space on the form for describing Plaintiff's limitations, Dr. Katzin wrote, "Right arm symptoms limit ability to do invasive cardiology." Dr. Rudnick also completed an APS, which stated that he had not seen Plaintiff since 2003, but indicated that Plaintiff had symptoms of upper and lower back pain. On or about July 24, 2006, Plaintiff submitted an addendum to his benefit application, stating that he was an "M.D. specializing in Electrophysiology," that he had "gradually developed neurological symptoms in [his] back and fingers," that by August 2004, his symptoms have become more pronounced and affected his ability to work such that he "significantly reduced [his] hours and moved [his] family to Israel," that he would work for a week and a half in the U.S. and then spend the successive weeks in Israel, and that he was limited in the amount of time he could work in his occupation and became exhausted after a few hours of work.

Jeffrey Smith ("Smith"), a Vocational Case Manager ("VCM") for Defendant, advised in a September 19, 2006 memorandum that Plaintiff's occupation was "Electrophysiologist." Smith concluded that for 24 months prior to the claimed date of disability, Plaintiff was working as an electrophysiologist. Although Plaintiff's work volume decreased after August 2004, he was "continuing to work with his own specialty of Electrophysiology."

Elias Dickerman, M.D., Ph.D., ("Dr. Dickerman") Board Certified in Neurology, reviewed Plaintiff's records in October of 2006. Although MRI reports from January 2004 and December 2005 referred to herniated discs, Dr. Dickerman determined that the reports' findings are more consistent with protrusions and herniations. Dr. Dickerman concluded his report as follows:

> Based on the available records, Dr. Weiss has been capable of continuing to perform full-time activities in a light capacity category level. The original recommendations made to him by Dr. Rudnick, to wear a thoracolumbar orthotic device while wearing the lead apron, would be appropriate. Except for that specific accommodation, there are no specific restrictions from performing a light capacity category job on a full-time basis. I find no documentation that he

has been precluded from working on a fulltime basis as a physician specializing in electrophysiology from August 2004 to the present.

On November 13, 2006, Defendant denied Plaintiff's LTD claim due to lack of evidence that Plaintiff was "precluded from performing the Material Duties of his Own Occupation as a Physician specializing in Electrophysiology 40 hours per week as of August 2004."

Plaintiff appealed the denial decision on May 11, 2007. On September 27, 2007, Defendant notified Plaintiff that it was upholding the denial decision because there was "no medical reason" why he could not work 40 hours per week as an electrophysiologist as of August 2004. Defendant advised that an additional review would be performed by its Administrative Appeal Unit.

As part of that review, an independent medical review was performed by Richard Bennett, M.D., Board Certified in Neurology and Electromyography, who advised that:

> [Plaintiff] is capable of performing full-time light level work. He would have no limitations insofar as walking and standing [are] concerned. He would have no limitations insofar as reaching, handling, and fingering are concerned. He does not require working 10 days followed by two weeks of inactivity. This would not be a medically indicated accommodation for [Plaintiff's] condition.

On December 5, 2007, Defendant notified Plaintiff of its final denial decision.

Plaintiff claims that his pain has dissipated because he is no longer wearing his lead apron. Plaintiff currently works out at a gym in Israel two to three days a week, doing aerobic exercise and lifting weights, so long as the weight lifting does not involve the muscles of the neck and upper back. He also plays tennis, swims and bikes. Plaintiff testifies in his Inter-

rogatory Answers that he became totally disabled from his own occupation on or about December 26, 2007.

Plaintiff brings a claim for breach of contract, seeking damages in the amount of past due disability benefits in the amount of $230,000.00, any and all benefits the contract provides, costs, attorneys' fees and such other relief that the Court deems just and proper.

## II. *LEGAL STANDARD*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party moving for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(c)). An issue is "material" if it is a legal element of the claim under applicable substantive law that may affect the resolution of the action. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue is "genuine" if the record, taken as a whole, could lead a rational trier of fact to find for the non-moving party. *See id.* The movant may meet this standard by presenting evidence demonstrating the absence of a dispute of material fact or by showing that the nonmoving party has not presented evidence in support of an element of its case on which it bears the burden of proof.

*Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53. The moving party need not supply "affidavits or other similar materials negating the opponent's claim." *Id.*

Once the moving party meets its burden, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Id.* at 324, 106 S.Ct. at 2553 (quoting Fed.R.Civ.P. 56(e)). Although the nonmovant need not present evidence that would be admissible at trial, it may not rest on his pleadings. *Id.* "[T]he plain language of rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Id.* at 322, 106 S.Ct. at 2552. *See also Graham v. State Farm Mut. Ins. Co.,* 193 F.3d 1274, 1281–82 (11th Cir.1999).

### III. *DISCUSSION*

 The relevant Policy language provides as follows:

> You are required to be Disabled only from your Own Occupation.
> You are Disabled from your Own Occupation if, as a result of Physical Disease, Injury, Pregnancy of Mental Disorder:
> 1. You are unable to perform with reasonable continuity the Material Duties of your Own Occupation; and
> 2. You suffer a loss of at least 20% if your Indexed Predisability Earnings when working in your Own Occupation....

(DE 1, p. 14.)

Plaintiff has presented no evidence, save his self-serving statements, that he was unable to perform his occupational duties with reasonable continuity. To the contrary, Plaintiff actually worked in his own occupation throughout and beyond the benefit waiting period. Plaintiff admits in his response to the summary judgment motion that he "worked performing all of the duties of an electrophysiologist since August 2004 through December 2007." He admits that from August 2004 through December 2007, he typically spent 12 consecutive days in the U.S. each month and the other 18 days in Israel. He also admits that he worked every day that he was in the U.S., as he would typically "arrive on a Sunday night or Monday morning, work that week, take call that weekend, work a few days into the following week and then depart."

Plaintiff not only continued working but also performed all the duties of his occupation. To the extent that wearing a lead apron is a duty of an electrophysiologist, Plaintiff wore a lead apron as much as he needed to when he was working. Conversely, if he was able to perform "all" of his duties without wearing a lead apron, then wearing a lead apron was clearly not a material duty of his occupation. Notably, Plaintiff did not suffer pain severe enough to require over the counter or prescription pain medications.

The Policy provides that working an "average of more than 40 hours per week" is not a material duty of any insured's occupation. Plaintiff admits that prior to August 2004, he "worked an average of 75–80 hours per week," and that after August 2004, he reduced his weekly work hours by "approximately half." Since half of 75 to 80 hours is 37 to 40 hours, Plaintiff thus admits that he was working at a pace equaling roughly 37 to 40 hours per week during his monthly stays in the U.S.

Plaintiff maintains that his unconventional work schedule did not constitute "working with reasonable continuity." That Plaintiff kept an unconventional

schedule is not probative of his medical condition, as Plaintiff's working 12 consecutive days each month and then taking regularly scheduled time off is not evidence that he was *incapable* of working a conventional schedule. Were this argument to prevail, anyone could "prove" disability simply by deciding not to work. Plaintiff must prove that his schedule was not due to any choice on his part but rather was forced upon him because he was physically incapable of working a conventional schedule.

■ Plaintiff's "evidence" to that effect consists of his own deposition testimony, his own statement attached to his claim form and an affidavit from Dr. Katzin. This Court has recently recognized that mere "uncorroborated allegations by a plaintiff in an affidavit or deposition will not create an issue of fact for trial sufficient to defeat a well-supported motion for summary judgment." *Dent v. Giaimo,* 606 F.Supp.2d 1357, 1359 (S.D.Fla.2009) (citing *Earley v. Champion Int'l Corp.,* 907 F.2d 1077, 1080 (11th Cir.1990)). Plaintiff's own statements are insufficient to create an issue of material fact.

■ Plaintiff also submits an affidavit from his sometime treating physician, Dr. Katzin, but that affidavit contains no opinion or evidence that Plaintiff's working 12 straight days and then taking two weeks off every month was medically necessary. Nor does the affidavit say that Plaintiff reduced his work schedule upon the medical advice of Dr. Katzin. Dr. Katzin merely states that he was "aware that sometime in 2004, [Plaintiff] reduced the number of days he worked."

Dr. Katzin says nothing about the number of days or hours Plaintiff worked, how often Plaintiff worked, or what duties Plaintiff performed. It is an established

fact that Plaintiff performed all of his duties as an electrophysiologist for 12 straight days in each and every month during the time Dr. Katzin discusses, and yet there is no mention of same in Dr. Katzin's affidavit. Dr. Katzin also does not address that even while performing all of his occupational duties for a continuous 12 day period every month, Plaintiff never had any need of pain medications, either prescription or over the counter.

Dr. Katzin, according to his own affidavit, did not examine Plaintiff at any time between March 2004 and August 2005. Dr. Katzin states that on "several occasions" between March 2004 and August 2005 he spoke with Plaintiff while both were "performing rounds" at a hospital, but Dr. Katzin does not remember when these conversations occurred and did not document them in any way. The only thing he recalls Plaintiff telling him was Plaintiff's alleged difficulties with "procedures that required him to wear a lead apron."

■ An "expert's opinion on a plaintiff's level of disability" is "insufficient to support [a] finding that plaintiff was totally disabled" if the expert fails to "take into account all the material facts disclosed by the evidence." *Pace v. Capobianco,* 283 F.3d 1275, 1280 (11th Cir.2002) (citing *United States v. Burns,* 69 F.2d 636, 639 (5th Cir.1934)).[1] Since Dr. Katzin did not take into account the material facts involving Plaintiff's actual, consistent performance of all of his occupational duties, Dr. Katzin's opinion does not suffice to establish a genuine factual issue. *See Viterbo v. Dow Chemical Co.,* 826 F.2d 420, 423 (5th Cir.1987) (affirming summary judgment for defendant and upholding exclusion of physician's expert testimony where physi-

---

1. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) made binding on the Eleventh Circuit all decisions of the Fifth Circuit issued prior to September 30, 1981.

cian's opinion was based on plaintiff's "oral history," which "lacked reliability because it was incomplete in a critical area"). Dr. Katzin's testimony is nothing more than Plaintiff's own testimony "dressed up and sanctified as the opinion of an expert." *Id.* at 424. The rules governing admissibility of expert testimony were "not intended ... to make summary judgment impossible whenever a party has produced an expert to support its position." *Evers v. Gen. Motors Corp.,* 770 F.2d 984, 986 (11th Cir.1985) (quoting *Merit Motors, Inc. v. Chrysler Corp.,* 569 F.2d 666, 673 (D.C.Cir. 1977)). A party "may not avoid summary judgment solely on the basis of an expert's opinion that fails to provide specific facts from the record to support its conclusory allegations." *Id.* Expert testimony is admissible only if the expert "knows of facts which enable him to express a reasonably accurate conclusion." *U.S. v. City of Miami,* 115 F.3d 870, 873 (11th Cir.1997). Thus, to be probative, an expert affidavit "supporting or opposing a motion for summary judgment" must set forth a "process of reasoning beginning from a firm foundation." *Martinez v. Weyerhaeuser Mtg. Co.,* 959 F.Supp. 1511, 1515 (S.D.Fla.1996). Dr. Katzin's affidavit fails to create an issue of fact as to whether Plaintiff was disabled to the point where he was unable to perform the material duties of an electrophysiologist with reasonable continuity.

Plaintiff has presented no evidence that he was unable to perform the material duties of his own occupation with reasonable continuity subsequent to August of 2004. A lack of evidence as to any element "necessarily renders all other facts immaterial and requires the Court to grant the motion for summary judgment." *Dent,* 606 F.Supp.2d at 1359 (citing *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2548). Summary judgment for Defendant is therefore warranted.

## IV. CONCLUSION

THE COURT, having considered the pertinent portions of the record and being otherwise fully advised, hereby

ORDERS AND ADJUDGES that Defendant's Motion for Summary Judgment, filed July 17, 2009 [**DE 34**], is GRANTED. Final judgment shall be entered by separate order.